IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MITCHELL CLEMENTS, on behalf of himself
and all others similarly situated,

                    Plaintiff,                  OPINION AND ORDER

    v.

                                                  19-cv-1051-wmc

WP OPERATIONS, LLC,

                  Defendant.

---

In this putative class and collective action, Mitchell Clements brings suit against WP Operations, LLC, alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, as well as various Wisconsin labor laws and regulations. Plaintiff's motion for conditional certification of the FLSA collective action and authorization of notice to similarly situated persons is now before this court. (Dkt. #18.) The court will grant plaintiff's motion for the reasons discussed below. Subject to minimal alterations, the court will also allow the proposed notice to be posted and sent to potential class members.

ALLEGATIONS OF FACT[1]

Defendant WP Operations runs a mining operation that produces industrial frac sand, including a sand mine located in Hixton, Wisconsin, and two railyards -- one located

---

[1] When considering a motion for conditional certification, the court draws the relevant facts from "the complaint and any affidavits that have been submitted." *Bitner v. Wyndham Vacation Resorts, Inc.*, 301 F.R.D. 354, 357 (W.D. Wis. 2014) (quoting *Austin v. CUNA Mut. Ins. Soc'y*, 232 F.R.D. 601, 606 (W.D. Wis. 2006)). "Plaintiffs' materials are the proper focus at this preliminary stage, not defendants'," and any factual disputes are resolved in plaintiff's favor. *Id.*

in Taylor, Wisconsin (the "Taylor railyard") and one located in Humbird, Wisconsin (the "Humbird railyard"). The Taylor railyard and the Humbird railyard are located two and fifteen miles from the Hixton mine, respectively.

Plaintiff Mitchell Clements worked for WP Operations as a Rail Operator at both the Taylor and Humbird railyards from July 2018 until December 2019. When work in the railyards was slow, he also worked at the Hixton mine. Clements' position was paid on an hourly basis and non-exempt, meaning that under the FLSA, he was entitled to overtime pay for hours worked in excess of 40 per week. Other hourly, non-exempt positions involved with WP Operations' mining production process include Belt Press Operator, Dry Plant Operator, Load Out Operator, Logistics Coordinator, Maintenance Electrician, Maintenance Technician, Mine Utility, Plant Load Operator, Plant Utility Operator, Quality Control Lead, Quality Control Technician, Rail Foreman, Wet Plant Operator, and Working Foreman (collectively, "Production Employees"). WP Operations currently employs approximately fifteen to sixteen Production Employees at its Wisconsin facilities, but within the last year and a half, it has employed as many as one hundred. Each Production Employee is to report to the foreman and team leader assigned for that position. Two other employees have opted in so far: Wendy Frosland, a Quality Control Technician, and Daniel Pokorny, a Railcar Operator.

With respect to Production Employees at all of its Wisconsin locations, including plaintiff Clements, WP Operations: (1) established the work rules, policies, and procedures by which they are to abide in the workplace; (2) controlled the terms and conditions of their employment; (3) provided them with work assignments and hours of work; (4)

established their work schedules; and (5) tracked and recorded their hours of work. As a result, Clements and the other Production Employees frequently worked in excess of forty hours in a workweek.

In the three years before the filing of this lawsuit, all Production Employees were also subject to uniform timekeeping policies and practices. Those policies and practices were communicated in part through the WP Operations Employee Handbook (the "Handbook"), including that: (1) all Production Employees must "report and record all time worked"; and (2) a "failure to be at the work place, ready to work, at the regular scheduled starting time" could result in discipline "up to and including termination." (Saso Dep., Ex. 4 ("Handbook") (dkt. #22-2) 14, 36-37.)

WP Operations tracked employee times using Orbit Solutions, an electronic timekeeping system with corresponding software. Clements and other Production Employees used the timeclock to "punch in and out" each workday. The standard scheduled shift for Production Employees began at 5:45am and ended at 6:00pm. In a written "Time Clock Policy," WP Operations explained that "[e]ach employee needs to punch the clock within a 7 minute window of either shift start time or shift end time." (Saso Dep., Ex. 3 ("Time Clock Policy") (dkt. #22-2) 1.) Thus, Production Employees customarily "punched in" for the start of their shift at 5:38am each workday.

Plaintiff further produced declarations from certain Production Employees representing that they performed various work activities immediately after punching in, including but not limited to attending pre-shift meetings. During these meetings, instructions would be given for daily tasks. For example, John Taylor -- a Rail Team Lead

-- would advise his team as to "what we were going to be doing that day, who was going to be working where, and what we were loading." (Taylor Dep. (dkt. #23) 22:17-20.) All of these pre-shift meetings were either conducted (or at least attended) by a team lead such as Taylor or a foreman. Taylor himself testified "[r]oughly" every pre-shift meeting that he conducted started before 5:45am. (*Id.* at 47:23-:25.) Taylor further testified that someone who missed the pre-shift meeting would not be formally disciplined, but would generally get "stuck with the job no one else wanted to do" that day. (*Id.* at 48:6-:11.) Still, the electronic timekeeping system automatically rounded to an employee's scheduled shift time, regardless of actual "punch in and out" times. Accordingly, an employee who clocked in at 5:38am, but whose shift did not begin until 5:45am, would only be compensated beginning at 5:45am.

Over the statutory period, the total difference between Clements' actual clock-in times and the timeclock software's rounded "calc" times resulted in 27 hours and 32 minutes of uncompensated work to the benefit of WP Operations.[2] (Pl.'s Reply (dkt. #34) 6.) Likewise, during the statutory period, the difference between all Railcar Operators' actual clock-in time and the rounded time totaled roughly 1,555 hours and 18 minutes, to the employees' detriment. (*Id.*) The punch-out times mirrored this same trend, with a difference generally favoring WP Operations between the actual and rounded time amounting to 608 hours and 48 minutes for all Railcar Operators. *Id.*

For its part, defendant points to evidence arguably showing that employees did *not*

---

[2] Under the FLSA, the statutory period for "look back" purposes is three years afte reh cause of action accrued where the cause of action arose from a willful violation. 29 U.S.C. § 255(a).

engage in work before 5:45am -- or at least that it did not suffer or permit its employees to work before the beginning of their scheduled shift. Specifically, it explains that the "actual work time" for first shift railyard employees is generally from 6:00am to 6:00pm, but that employees are paid starting at 5:45am to allow them 15 minutes to prepare for their shift. In particular, defendant points to declarations from Hamilton White, President of WP Operations, and Luke Boortz, WP Operations railyard foreman, who both represent that while employees were permitted to punch in up to seven minutes before their scheduled start time, they were prohibited from *working* until the scheduled start of their shift. (*See* White Decl. (dkt. #31) ¶ 32; Boorz Decl. (dkt. #32) ¶ 5.) The Time Clock Policy also states that "[i]f you work any hours outside your posted schedule, you will need to report these hours to your foreman." (Time Clock Policy (dkt. #22-1) 1.) Similarly, the Handbook provides that: "We expect that you would not punch out more than eight (8) minutes before the beginning or at the end of your shift. . . . [F]ailure to follow these procedures will result in disciplinary action up to and including termination of employment." (Handbook (dkt. #22-2) 43.) Moreover, WP Operations President White represents that beginning in late April of 2016, he personally communicated this timekeeping policy to employees "on at least three occasions." (White Decl. (dkt. #31) ¶ 35.) And Railyard Foreman Boortz further avers that he "did not start any pre-shift meetings or conversations prior to 5:45 A.M.," nor did he "witness[] any employees working before their scheduled shift times, unless [he] specifically asked the employee to do so," and that in such a case he "would send an email to payroll to advise of the change in working time." (Boortz Decl. (dkt. #32) ¶¶ 8, 11.)

5

OPINION

The FLSA authorizes employees to bring a "collective action" against an employer on behalf of themselves and "other employees similarly situated" for violations of the Act. 29 U.S.C. § 216(b). An employee must "opt in" to become a member of the collective action by filing a written consent to join the action.

Courts use a two-step approach for FLSA collective action certification. *See Austin v. CUNA Mut. Ins. Soc.*, 232 F.R.D. 601, 605 (W.D. Wis. 2006). The *first* step is "conditional" certification, which is where this case currently stands. At this stage, the court decides whether to authorize notice to potential members of the purported collective. *Id.* at 605. A plaintiff meets this burden by making "a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Austin*, 232 F.R.D. at 605 (internal citations omitted). However, conditional certification does *not* involve adjudicating the merits of the claims at this first stage of certification. *See Bitner*, 301 F.R.D. at *360 (citing *Fosbinder-Bittorf v. SSM Health Care of Wis. Inc.*, No. 11-cv-592-wmc, 2013 WL 3287634, at *4 (W.D. Wis. Mar. 21, 2013)).

If this first burden is satisfied, the court conditionally certifies the collective. *Id.* While defendant's evidence *may* be considered at this stage, it should only be given dispositive weight "where the plaintiff's showing is already very weak." *Freeman v. Total Sec. Mgmt.-Wisconsin, LLC*, No. 12-cv-461-wmc, 2013 WL 4049542, at *4 (W.D. Wis. Aug. 9, 2013). The *second* step typically occurs at the end of discovery, when "the court

6

determines whether the plaintiffs are *in fact* similarly situated to those who have opted in." *Kelly v. Bluegreen Corp.*, 256 F.R.D. 626, 629 (W.D. Wis. 2009) (emphasis added).

### I. Conditional Certification of the Collective Action

A "core requirement" of the FLSA is that "employers must pay their employees a wage for all the 'work' that they do." *Spoerle v. Kraft Foods Glob., Inc.*, 527 F. Supp. 2d 860, 862 (W.D. Wis. 2007) (citing 29 U.S.C. §§ 206, 207). The Act further requires an employer to compensate non-exempt employees "at a rate not less than one and one-half times the regular rate at which he is employed" for any hours worked in excess of forty in a workweek. 29 U.S.C. § 207(a)(1).

While the FLSA does not define "work," courts have construed this term broadly. *Spoerle*, 527 F. Supp. at 863. For example, work has been held to "encompass[] activities such as traveling on a railcar through a mine shaft, watching and guarding a building, and even standing and waiting." *Id.* (citing cases; internal citations omitted). As this court recently explained,

> an employer does not have to require work for it to be compensable; the work need only be suffered or permitted. An employer that knows or has reason to know that an employee is working cannot sit back and accept the benefits of the work without compensating for it. If an employer does not want work performed, it has a duty to exercise its control and see that the work is not performed.

*Morgan v. Crush City Construction, LLC*, 2020 WL 42717, at *5 (W.D. Wis. Jan. 3, 2020) (internal quotations and citations omitted).

Here, plaintiff argues defendant violated the FLSA by maintaining a policy and practice that failed to compensate its Production Employees for work performed between

7

the time they actually clocked in or out and the time they were scheduled for work to begin or end. Plaintiff has proposed the following collective action:

> All hourly-paid, non-exempt employees employed by Defendant within the three (3) year period immediately preceding the filing of this Complaint (ECF No. 1) who have not been compensated for all hours worked in excess of forty (40) hours in a workweek as a result of Defendant's failure to compensate said employees for pre-shift and post-shift hours worked and/or work performed while "clocked in" via Defendant's electronic timekeeping system.

(Pl. Br. (dkt. #19) 2.)

The court is convinced that plaintiff has made an adequate factual showing to merit conditional certification of the collective action. Specifically, plaintiff has produced evidence supporting a finding that: (1) Production Employees generally punched in for the start of their shift in the seven minute window before their scheduled shift; (2) during this period, Production Employees engaged in compensable work, including attending pre-shift meetings where instructions and work assignments were given; (3) defendant maintained a written policy requiring Production Employees to punch in or out within a seven minute window of their shift start or end time, or risk discipline; (4) defendant's timekeeping system accurately recorded when a Production Employee punched in and out, but for pay purposes consistently rounded up to the employee's scheduled start time; and (5) during the statutory period, the rounding measures for both clocking-in and -out used by defendant disadvantaged the employees by a total of 93,318 minutes or 1,555 hours and 18 minutes and 608 hours and 48 minutes, respectively, across all Railcar Operators. At this stage of the lawsuit, this evidence is adequate to show that all Production Employees

8

were victims of a common policy or practice that failed to properly pay them for all compensable work.[3]

Defendant's arguments to the contrary are not persuasive. First, defendant argues the range of positions implicated in plaintiff's proposed collective -- from railyard employees to mine employees -- is too wide to allow certification of an FLSA collective action. However, "plaintiffs do not have to show that the potential class members of a collective action have *identical* positions for conditional certification to be granted; plaintiffs can be similarly situated for purposes of the FLSA even though there are distinctions in their job titles, functions, or pay." *Jirak*, 566 F. Supp. 2d 845, 848-49 (N.D. Ill. 2008) (emphasis in original). At this stage, plaintiff only needs to have a "reasonable basis" for believing that he is similarly situated to other members of the collective action. *Austin*, 232 F.R.D. at 605.

Here, plaintiff has asserted and offered evidence that all Production Employees, regardless of specific role, were subject to the same practice and policies, including the allegedly unlawful use of an elective time keeping system and software. Other courts have found this to be sufficient even where job positions vary within an organization. *Abukar v. Reynolds Machine Co. LLC*, No. 19-CV838-JPS, 2019 WL 6896154 (E.D. Wis. Dec. 18, 2019) ("[W]hile it is true that the class members have different job classifications, shifts, and supervisors, this does not seem to have any bearing on whether the employees were all subject to the same unlawful rounding policy."). Here, an opt-in, performing the role of

---

[3] While plaintiff has produced far more evidence about pre-shift work than post-shift work, he has offered enough evidence to proceed on the post-shift claims for compensation as well.

9

Quality Technician, has already asserted harm based on these policies despite being in a different position, supporting the broad effect of defendant's policies. (Frosland Decl. (dkt. #21) ¶ 6.)

Relatedly, because plaintiff has only identified two other opt-ins, defendant argues that he has failed to show that the Production Employees overall were subject to a common unlawful policy. (Def. Opp'n (dkt. #29) 18.) The limited number of opt-in plaintiffs at the conditional certification stage -- before plaintiff's opportunity to give notice and receipt of requested discovery providing the names and addresses of its potential class -- is not fatal. Certainly, that two employees from the proposed class have already opted-in is relevant, just as is plaintiff's apparent ability to show broad application and effect of defendant's policies. *See Abukar*, 2013 WL 6896154, at *2 (the "minimal showing" requires no more than 'substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.'" (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001)); *Weninger v. General Mills Operations, LLC*, 344 F. Supp. 3d 1005, 1013 (E.D. Wis. 2018) ("the purpose of providing evidence of other interested class members is to assure the court that they exist").

Second, defendant argues that plaintiff has failed to show the existence of a common policy or practice that violates the FLSA because the Production Employees were *not* engaged in compensable pre- and post-shift work. While the court recognizes that defendant has produced some evidence to support this assertion, *plaintiff's* evidence is the focus at this stage, not defendant's, and factual disputes are resolved in plaintiff's favor. *Bitner*, 301 F.R.D. at 557. While defendant will obviously be free to proffer this evidence

at the appropriate time, plaintiff's modest evidence that the Production Employees engaged in pre- and post-shift compensable work is adequate for now.

Third, defendant's similar contention that its timeclock rounding policies were consistent with the law will have to await later consideration. For example, the regulations implementing the FLSA provide that an employer's timeclock practice that rounds "to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour," is acceptable "provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked." 29 C.F.R. § 785.48(b). Further, the regulations provide that "[i]n those cases where time clocks are used, employees who voluntarily come in before their regular starting time or remain after their closing time, do not have to be paid for such periods provided, of course, that they do not engage in any work." 29 C.F.R. § 785.48(a). Thus, a rounding policy is not *per se* violative of the FLSA, provided the employer compensates its employees for time actually worked.

However, plaintiff alleges and has offered at least some evidence that defendant's rounding policy did *not* fully compensate its Production Employees, and that it systematically rounded in the employer's favor to create a substantial shortfall in compensation over the relevant time period. Again, at this stage, this is enough to demonstrate a common policy that violates the FLSA. *See Abukar v. Reynolds Mach. Co. LLC*, No. 19-CV-838-JPS, 2019 WL 6896154, at *1 (E.D. Wis. Dec. 18, 2019) (conditionally certifying an FLSA collective action where plaintiff alleged that employer always rounded up or down to the half hour interval that resulted in the "least financial

obligation for the employers"); *Lacy v. Reddy Elec. Co.*, No. 3:11-CV-52, 2013 WL 3580309, at *14 (S.D. Ohio July 11, 2013) (finding an employer's rounding policy "facially defective" under the FLSA because "it always rounds up to the scheduled start time, no matter what time employees log in"); *Russell v. Ill. Bell Tel. Co.,* 721 F. Supp. 2d 804, 820 (N.D. Ill. 2010) (conditionally certifying FLSA collective action where employer's "rounding and log-out policies often caused plaintiffs to work unpaid overtime in increments of under eight minutes").

Fourth, defendant contends that its maintenance and enforcement of timekeeping and overtime policies which prohibit employees from starting work until their scheduled shift start time shows that it did not "suffer or permit" pre- or post-shift work. (Def. Opp'n (dkt. #29) 25.) For support, defendant points to *Tom et al. v. Generac Power Systems, Inc.*, Case No. 17-CV-1413, 2018 WL 3696607 (E.D. Wis. Aug. 3, 2018), in which the district court denied plaintiff's application for conditional certification based on a timeclock rounding policy that allegedly violated the FLSA. But *Tom* is distinguishable in at least two respects. In *Tom*, the defendant submitted eleven declarations supporting the implementation of the policies across its several sites. *Id.* at *4. Defendant here has failed to offer such robust proof negating plaintiff's proffer that these policies were being violated. In addition, it was pivotal to *Tom* that the managerial staff did not know or have reason to know that individual violations of the policy were occurring, *id.* at *5, while here plaintiff has produced some evidence that team leaders and managers were the ones responsible for scheduling meetings that caused employees to begin work before their scheduled start times, and disciplined them if not present. (Pl.'s Br. (dkt. #19) 5-6.)

Certainly, "the FLSA stops short of requiring the employer to pay for work it did not know about, and had no reason to know about." *Id.* (citing *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011)). Still, "the 'mere promulgation of a rule' against uncompensated work is not sufficient to avoid liability." *Bitner*, 301 F.R.D. at *358 (citing 29 C.F.R. § 785.13); *see also Morgan v. Crush City Construction, LLC*, 2020 WL 42717, at *5 (W.D. Wis. Jan. 3, 2020) ("If an employer does not want work performed, it has a duty 'to exercise its control and see that the work is not performed.'") (quoting 29 C.F.R. § 785.13). For now, plaintiff has produced adequate evidence to show that defendant knew about the alleged violations of the FLSA.

## II. Proposed Notice

The court next addresses plaintiff's proposed notice. Defendant argues that the notice requires many changes. First, defendant argues that the dates of birth and telephone numbers of the collective should not be distributed because of company confidentiality. However, plaintiff includes language requesting this information only for the first-class mailings that have been *returned*. (Pl. Br. (dkt. # 19) 13.) In previous cases, the failure of first-class mailing and physical posting has been sufficient reason for the parties to meet and confer about what information should be provided. *Weninger*, 344 F. Supp. 3d at 1015. Regardless, this court will not make that decision prematurely. Instead, counsel should meet and confer, then seek the court's authorization for permission to use alternative methods of notice agreed on by the parties, or if no agreement, propose competing approaches.

Second, defendant argues that they should not have to display the notice at WP Operations because first class mail sufficiently gives the proposed class notice. Defendant's suggested restriction, one attempt via U.S. mail, is both an unconventional and ill-considered limitation as "posting at the defendant's work facility is a regularly approved method of notice in FLSA collective actions," *Weninger*, 344 F. Supp. 3d at 1014, and "requiring defendants to post notice in the workplace is neither unnecessary nor overly intrusive." *Freeman*, 2013 WL 4049542, at *11; *see also Morgan*, 2020 WL 42717, at *7.

Third, defendant takes issue with the term "production employees" as a term of art not utilized by WP Operations. However, plaintiff defines "Production Employees" as "hourly-paid, non-exempt employees" of defendant, and its notice includes that definition. (Pl.'s Br. (dkt. #19-1) 1.) The court recognizes a plaintiff's discretion in drafting its notice, particularly where the potential opt-in class may be aware of the term's use in this context and it poses no barrier or burden to the defendant. *Sylvester v. Wintrust Financial Corporation, et al.*, No. 12 C 01899, 2013 WL 5433593, at *6 (N.D. Ill. Sep. 30, 2013) ("Absent reasonable objections by either the defendant or the Court, plaintiffs should be allowed to use the language of their choice in drafting the notice." (internal citations omitted)). While WP Operations disagrees with this characterization of "Production Employees" as overbroad to include those not similarly situated to plaintiff, but as defined, these employees are in fact similarly situated in terms of being subject to the same timeclock system and policies as plaintiff or at least the court will allow plaintiff to proceed on that assertion.

Fourth, defendant requests two content changes: (1) the notice should inform prospective opt-in plaintiffs that they may be required to participate actively in the litigation and may be found responsible for defendant's cost defending the case if defendant prevails; and (2) the statement that the court takes no position on the merits of the case and related inquiries should appear on page one instead of page three. Defendant's first request will be denied. As this court has previously explained, "the statute is silent with respect to fee shifting for prevailing defendants" and a warning regarding potential costs "would chill participation in collective actions." *Austin*, 232 F.R.D. at 608; *Morgan*, 2020 WL 42717, at *7. Addressing the second, *Hoffman-La Roche* teaches that "district courts avoid the appearance of 'judicial endorsement of the merits of the action.'" *Hoffmann-La Roche v. Sperling*, 493 U.S. 165, 174 (1989). Still, defendant has produced no case law to support its position that the disclaimer must appear on the first page, and this court has previously approved notices in which judicial disclaimer appears after page one. *See, e.g.*, Revised Notice, *Morgan v. Crush City Construction, LLC*, 19-cv-27-wmc (dkt. #36-1). Accordingly, this request will also be denied.

Finally, defendant objects that the "Consent to Join Form" need only be timely "postmarked" for potential opt-ins to participate. Quoting the language in 29 U.S.C. § 216(b), defendant specifically argues that consent must be "filed in the court" for a plaintiff to opt-in. However, this statutory language does not prohibit use of postmarking. *E.g., Schaefer-LaRose v. Eli Lilly & Co.*, 2008 WL 5384340, at *2 (S.D. Ind. Dec. 17, 2008) ("The order that timeliness is to be determined by the postmark date in the event of mailing set a reasonably certain means for determining when a Notice was mailed to Plaintiffs'

counsel."). Moreover, nothing in § 216(b) suggests that the deadline to opt-in must be the same as the effective filing date. Along with the above, plaintiff will be granted discovery for the names and last known addresses of all putative collective members for notice to be sent by U.S. mail. *Hoffmann La-Roche*, 493 U.S. at 170 (allowing discovery of relevant employees' names and addresses in an ADEA case because the discovery was relevant to the subject matter of the action and there were no grounds for limiting it).

For the reasons stated above, therefore, the court will grant Clements' motion for conditional certification of his proposed FLSA collective action without requiring substantive changes to its proposed notice.

ORDER

IT IS ORDERED that:

1) Plaintiff's motion for conditional certification of the FLSA collective action and authorization of notice to similarly situated persons (dkt. #18) is GRANTED. If plaintiff wishes to pursue other means of contact with potential opt-in plaintiffs after the posting and mailed notices have been sent, the parties shall meet and confer within a reasonable time with respect to information provided about the potential opt-in class.

2) The deadline to seek decertification of this conditional FLSA class is reset for September 10, 2021.

Entered this 26th day of May, 2021.

BY THE COURT:
/s/

_____

WILLIAM M. CONLEY
District Judge